**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**GREGORY SELDEN**

      **Plaintiff, Individually and on**          **Civil Action: 1:16-cv-00933**
      **Behalf of all Others Similarly Situated,**

**v.**

**AIRBNB, INC.**

      **Defendant.**

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT AIRBNB, INC.'S**
**MOTION TO COMPEL ARBITRATION AND DISMISS OR, IN THE ALTERNATIVE**
**TO STAY PENDING ARBITRATION**

COMES NOW, Plaintiff Gregory Selden, by and through his counsel Emejuru &

Nyombi LLC, and in Response in Opposition to Defendant Airbnb Inc.'s Motion to Compel

Arbitration and Dismiss or, in the Alternative, to Stay Pending Arbitration and respectfully avers

as follows:

**INTRODUCTION**

Plaintiff Gregory Selden, as well as those similarly situated, brought forth this lawsuit

against Airbnb Inc. (hereinafter "Airbnb") because Airbnb's operational platform is inherently

discriminatory. Statistical evidence has proven that it's commercial design disproportionately

impacts African American consumers seeking accommodations. From its inception, Airbnb Inc.

has sought to maintain a pattern and practice of mandating its users to conspicuously identify

themselves through the use of head shots or facial photographs, biological names and other

personal identifiers before booking public accommodations. Plaintiff maintains and will continue

to maintain that Airbnb Inc., a provider of online content, enables its hosts, agents, representatives

or servants of any type to discriminate on its platform. Airbnb is vicariously liable for the actions of its host agents, employees, representatives or servants of any type were taken in the line and scope of such host individuals' employment, agency or representation.

Defendant Airbnb now moves to compel Selden and those similarly situated into arbitration. But its attempt should fail.  At no time did Selden ever enter into or assent to any terms to arbitrate with Airbnb. Indeed, Airbnb's motion tries to piecemeal various purported terms of service spanning from 2014 to 2016 in order to satisfy the question as to "where and how" it can bind Selden. It's position and logic are not only confusing, but seemingly deceptive to consumers like Selden.

Despite the fact that Plaintiff was discriminated against by Airbnb's host because of his race, Plaintiff's lawsuit maintains that he signed up through an entirely different process than what Airbnb presents to this court. While representing them as "modifications," Airbnb suggests now that it can demonstrate that Plaintiff's assented with its **current** sign-in procedure and are now relying on Airbnb's **current** Terms of Service updated as recently as May 2016. Through this response, Selden will dispute that he agreed to the terms of service relied upon by Airbnb, dispute the purported sign-in procedures described by Airbnb are enforceable, dispute that he followed the alleged sign in procedures described by Airbnb, and dispute that there was a manifestation of assent as to any of the alleged terms of service. Lastly, Plaintiff, as well as those similarly situated, do not have claims that are within the scope of the arbitration clause purportedly asserted by Defendant because Selden's statutory claims are prohibited from arbitration.

### BACKGROUND AND FACTS FOR GREGORY SELDEN

Plaintiff's allegations are clear. In March 2015, Mr. Selden, an African American male, accessed Airbnb.com on his mobile phone. Ex. A, ¶ 1-2 When Selden accessed the website on his

mobile phone, he was presented with a Facebook.com button. Ex. A, ¶ 3 He immediately clicked the Facebook button. *Id.* Subsequently, he was routed from the Airbnb.com to Facebook.com. *Id.* While on Facebook.com, Selden's personal information, including his name, profile picture and other personal information were extracted from Facebook.com and he was automatically re-routed back into Airbnb.com. Ex. A, ¶ 4 The information from his Facebook.com account was automatically populated onto Airbnb.com. *Id.* While on Facebook.com, Selden was never presented with an icon or box indicating that he was agreeing to any Airbnb.com terms and conditions of service. Ex. A, ¶ 5

Selden used his newly created Airbnb profile to seek accommodations in Philadelphia, Pennsylvania. Ex. A, ¶ 6. But he was rejected accommodations because the Airbnb host, agent or representative indicated to him that the listing was not available. Ex. A, ¶-7 After Selden was denied accommodations because he was African American[black], he then created two Caucasian [white] male profiles on the same March 2015. Ex. A, ¶ 8 The Airbnb host subsequently accepted the two Caucasian imitation profiles. Ex. A, ¶ 8 Selden did not access the platform again after his initial encounter in March 2015 because he was deterred by the discriminated he was subjected to at the hands of Defendants host, agent, or representative.[1] Ex. A, ¶ 9.

## ARGUMENT

## LEGAL STANDARD

Defendant has styled its Motion as a Motion to Compel Arbitration and Dismiss or Stay Pending Arbitration. Such motions are properly reviewed under the summary judgment standard of Rule 56(c). *Hughes v. CACI, Inc.*, 384 F. Supp. 2d 89, 92-93 (D.D.C. 2005) ("'inasmuch as the

---

[1] For the remainder of this brief Plaintiff will refer to Airbnb's host, agent or representative as simply a "host." The term is derived from the alleged terms of service produced by Airbnb.

district court's order to arbitrate is in effect a summary disposition of the issue of whether or not there has been a meeting of the minds on the agreement to arbitrate[,]' consideration of the motion according to the 'standard used by district courts in resolving summary judgment motions pursuant to Fed. R. Civ. P. 56(c) . . . is appropriate.'") (quoting *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 n.9 (3d Cir. 1980); also citing *Nelson v. Insignia/Esg, Inc.*, 215 F. Supp. 2d 143, 147 (D.D.C. 2002); *Lok Tio v. Wash. Hosp. Center*, 2004 U.S. Dist. LEXIS 23503, 2004 WL 2663149, at *2-3 (D.D.C. 2004)).

Summary judgment will be granted when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits or declarations, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). A fact is "material" if it might affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248, 106 S. Ct. 2505, 9 L. Ed. 2d 202 (1986).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The nonmoving party then must "go beyond the pleadings and by [its] own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id*. at 324 (internal quotations omitted); *see Laningham v. U.S. Navy*, 259 U.S. App. D.C. 115, 813 F.2d 1236, 1242 (D.C. Cir. 1987) (nonmoving party has affirmative duty "to provide evidence that would permit a reasonable jury to find" in its favor).

In deciding a motion for summary judgment or, in this case, a motion to compel arbitration, the "court must draw all reasonable inferences in favor of the nonmoving party, and it may not

make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). Ultimately, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52. As the foregoing demonstrates, a genuine issue has been established for this case and therefore summary judgment is not appropriate.

## I.    SELDEN DID NOT AGREE TO ARBITRATION

Arbitration is a matter of contract. Thus, the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute. *W&T Travel Services., LLC v. Priority One Servs., Inc*. 69 F. Supp. 3d 158 (D.C. Dist. 2014).  A court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate that dispute. *Id*.  See also *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 69 (2010); (holding it was noted that Arbitration is a matter of contract. Thus, the Supreme Court has directed that "the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute.").  In making that determination, the court must apply the federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Federal Arbitration Act. *Id*. When ordinary contracts are at issue; it is up to the parties to determine whether a particular matter is primarily for arbitrators or for courts to decide. *Id*. Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit. *Id*.  Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator. *Id. See also First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938 (1995).

In most circumstances, there are two questions a court must answer before it can order Plaintiff submit their claims to arbitration, namely under the Federal Arbitration Act (FAA), 9 U.S.C.S. § 1 et seq., and applicable state law;

1) Did the parties enter into a valid and enforceable arbitration agreement and, if they did;

2) Does the arbitration agreement encompass the claims raised in the complaint?

*Id at Booker v. Robert Hall Int'l, Inc.,* 315 F. Supp. 2d 94 (D.C. Dist. 2004). In the instant case, Plaintiff maintains that the parties never entered into a valid and enforceable agreement and that the terms do not encompass the claims raised in the class complaint. Plaintiff never agreed to arbitrate any disputes with Defendant Airbnb nor did anyone acting on Plaintiff's behalf agree to arbitrate any disputes with Defendant.

### A.  **AIRBNB'S ALLEGED TERMS OF SERVICE**

Airbnb incorrectly argues that "Plaintiff agreed to Airbnb's Terms of Service at least four times when creating four separate accounts." Doc. 13-1pg. 6 ¶ 2. And that he created a new account on Airbnb on May 5, 2016. Doc. 13-1pg. 8 ¶ 2. It subsequently plasters the 2016 terms of service in various places within its brief. However, and most importantly, by and through its representative Kyle Miller, the company quietly concedes that Selden first gained accessed to the Defendant's accommodations website in March 2015. Doc. 13-2 ¶ 8. Defendant also attaches what purports to be terms pertaining to the time frame Selden initially accessed Airbnb.[2] See Doc. 13-4, Exhibit B. Defendant also attaches 'screenshots' purporting to depict what kind of  initial interaction a user like Selden may have encountered when trying to gain access for services on its website.[3] See Doc.

---

[2] Exhibit B appears to show Terms of Service that were updated by Defendant as of June 30, 2014.

[3] The court should note that Miller declaration is completely void as to whether the screen shots in Exhibit A are those that would have been seen by a prospective user similar to Selden on a **mobile device** at the time in question. As noted herein, Plaintiff maintains all rights to objections within this response.

13-3, Exhibit A. As alleged, Mr. Selden accessed the website in March 2015. Which means that the only terms that would have pertained to Selden at the time are the 2014 terms of service. See Doc. 13-4, Defendant's Exhibit B. As carefully demonstrated below, the procedure by which Airbnb sought to bind Selden to its terms are not recognized by courts as legally enforceable.

**B.  SELDEN DID NOT AGREE TO AIRBNB'S ALLEGED TERMS OF SERVICE**

i.  <u>Click wrap agreements are enforceable procedures for web transactions and they were not attributable to Airbnb at the time Selden accessed it</u>

A clickwrap agreement 'presents the user with a message on his or her computer screen, requiring that the user manifest his or her assent to the terms of the license agreement by clicking on an icon. *Mohamed v. Uber Techs., Inc.* 109 F. Supp. 3d 1185 (Cal. Nor. Dist. 2015). (quoting *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 22 n.4 (2d Cir. 2002)). By contrast, the "defining feature of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement *or even knowing that such a webpage exists." Id. See also Tompkins v. 23andMe, Inc.,,* 2014 U.S. Dist. LEXIS 88068, (citation omitted) (emphasis added). Courts tend to enforce clickwrap agreements but not browsewrap agreements. *Id*.

Airbnb believes that its sign up procedure was in the form of a "clickwrap agreement." Doc. 13-1, pg. 13, ¶ 3. The company cites to an array of authority at both the state and federal level supporting the adoption of "clickwrap" agreements as the recognized policy to enforce online agreements. *Mohamed v. Uber Techs., Inc.,* 109 F. Supp. 3d 1185, 1197 (N.D. Cal. 2015), *Nguyen v. Barnes & Noble Inc.,* 763 F.3d 1171, 1175 (9th Cir. 2014), *Fteja v. Facebook, Inc.,* 841 F. Supp. 2d 829, 835 (S.D.N.Y. 2012), *In re Facebook, Biometric Info. Privacy Litig.* 2016 U.S. Dist LEXIS 60046 (N.D.Cal. 2016) (holing the two "wraps" also differ in the way the offeree manifests

assent. For clickwrap agreements, **users are "required to click on an 'I agree' box"**; **they must expressly manifest assent to the terms and conditions**. *Nguyen*, 763 F.3d at 1175-76….our Circuit has recognized that the closer digital agreements are to the clickwrap end of the spectrum, the more often they have been upheld as valid and enforceable.   *See Nguyen*, 763 F.3d at 1176 ("[c]ourts have . . . been more willing to find the requisite notice for constructive assent where the browsewrap agreement resembles a clickwrap agreement" and "a click wrap agreement, is familiar to most internet users and requires a user or prospective customer to check a box or click an "I agree" button after being presented with terms and conditions (or more realistically after declining the opportunity to review the often voluminous terms and conditions). *See also Savetsky v. Pre-Paid Legal Servs*., 2015 U.S. Dist. LEXIS 17591 (Cal. Cen. Dist. 2015). "Essentially, under a clickwrap arrangement, potential licensees are presented with the proposed license terms and forced to expressly and unambiguously manifest either assent or rejection prior to being given access to the product." *Register.com, Inc. v. Verio, Inc*., 356 F.3d 393, 429 (2d Cir. 2004). Because "[b]lanket assent to a form contract is still assent, albeit a more attenuated form than the assent that drives contract theory," courts generally find that clickwrap agreements are enforceable. Lemley, Terms, supra at 466.  *See also Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 911-12 (N.D. Cal. 2011) (enforcing arbitration clause where "Plaintiff was provided with an opportunity to review the terms of service in the form of a hyperlink **immediately under the 'I accept' button"**) *See Hancock v. AT&T Co.,* 701 F.3d 1248 (10th Cir. 2012) (holding that clickwrap agreements are increasingly common and have routinely been upheld).

Finally, even District of Columbia courts have long held that clickwrap agreements are primary means to enforce online agreements. See *Forrest v. Verizon Communications, Inc.,* 805 A.2d 1007, 1010-11 (D.C. Cir. 2002) (holding that adequate notice was provided of clickwrap

agreement terms where users **had to click "Accept"** to agree to the terms in order to subscribe, an admonition in capital letters was presented at the top of the agreement to read the agreement carefully, the thirteen-page agreement appeared in a scroll box with only portions visible at a time, and the forum selection clause was located in the final section and presented in lower case font); also cited in *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229 (P.A. Dist. 2007).

Despite the aforementioned authority, Airbnb's citations categorically invalidate their method of binding users like Selden. In each of the aforementioned cases, the procedures used all had critical elements that were non-existent on Airbnb's platform at the time Selden accessed it in March 2015 when the discrimination took place.

ii. Selden did not affirmatively assent through a clickwrap agreement

Airbnb cannot have it both ways. The company appears to argue that when Selden created his account in March 2015, he was confronted with a "sign up button." Doc. 13-1 pg. 8 ¶ 2. And that the "sign up" button**(s)** was the designated clickwrap agreement for Selden.[4] However, Airbnb's Miller essentially abandons this notion when he spells out how the established authority routinely enforce a click wrap agreement. Doc. 13-2 pg. 3 ¶ 9. Miller essentially states that the company took steps to legally comply **after** Selden signed up.

Airbnb cannot effectively argue that Selden assented to its previously updated terms of service when he sought accommodation in March 2015 because its procedures at the time Selden used the platform failed to comport with prevailing legal standards with regard to binding online service agreements. As illustrated in their own exhibits, Airbnb purports to bind a consumer through use of a confusingly placed browse links of service that do not conform to accepted standard where consumers are required to click through and must <u>affirmatively indicate assent</u>. *Id*

---

[4] Plaintiff further analyzes the multiple 'Sign Up' button issue below.

*at Mohamed. See also* Doc. 13-3, Exhibit A.  Airbnb did not automatically display the terms of service and require an affirmative acceptance of its terms terms upon the terms being conspicuously presented to the customer for reading, nor did Airbnb have a window page for a prospective user to scroll through the terms of service and agree before continuing. Indeed, Airbnb did not have a button that unmistakably states "I Accept" adjacent to a clearly-marked hyperlink to the terms of service. These are recognized earmarks of legally enforceable online agreements that were never attributable to Airbnb in March 2015. Finally, Selden did not access the Airbnb platform at anytime after March 2015. *Supra.* Airbnb cannot escape now by proving subsequent alleged remedial measures as evidence of legally accepted principles to bind Mr. Selden.

     iii.  <u>The authority that Airbnb chiefly relies is not applicable to this case</u>

     As a matter of discussion, Airbnb attempts to rely on *Fteja v. Facebook, Inc.* 841 F. Supp. 2d 829 (N.Y. South. Dist. 2012)[5] because it believes the procedure used by Facebook are very similar to its own [Airbnb] "Sign Up" feature. Airbnb "chiefly" relies on this authority in order to somehow salvage its archaic and non-enforceable method of binding previous users like Selden prior and up to March 2015. But again, it concedes that more recent authority decided **after Selden** is the more appropriate authority to discern whether there was actual mutual assent between the parties.

     Nothwishtanding, the procedures in *Fteja* are not the least bit analogous to the case at hand and should be distinguished as such. In *Fteja,* the court found that Facebook had a legally enforceable procedure on grounds that:

"A putative user is asked to fill out several fields containing personal and contact information. *See* http://www.facebook.com. The putative user is then asked to click a button that

---

[5] The court should note that *Fjeta* is listed as "cautionary" authority because its principles are out of date (e.g. 2012). Also, that the Plaintiff in *Fteja* was known as chronic Facebook user who was consistently put on notice about the terms of service during his years and years of usage.

reads "Sign Up." After clicking this initial "Sign Up" button, the user proceeds to a page entitled "Security Check" that requires a user to reenter a series of letters and numbers displayed on the page. Below the box where the putative user enters that letter-number combination, the page displays a second "Sign Up" button similar to the button the putative user clicked on the initial page. **The following sentence appears immediately below that button**: "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Service." The phrase "Terms of Service" is underlined, an indication that the phrase is a hyperlink, a phrase that is "usually highlighted or underlined" and "sends users who click on it directly to a new location—usually an internet address or a program of some sort."

*Id at Fteja.* This method is no way, shape or form similar to Airbnb's sign-up procedure which Defendant attempts to rely on as a basis for binding Mr. Selden to an alleged arbitration agreement. The court in *Fteja* took careful note of the fact that Facebook's method contained a "Sign Up" button similar to the **previous screen**, with a sentence "**immediately below that button**." The court reasoned that in order to have obtained a Facebook account, Fteja must have clicked the **second** "Sign Up" button. Accordingly, if the phrase that appears below that button is given effect, when Fteja clicked "Sign Up," he "indicat[ed] that [he] ha[d] read and agree[d] to the Terms of Policy." The courts rationale was that the second step provided to *Fteja* by Facebook undoubtedly gave him the opportunity to view the terms and unequivocally assent to them.

iv. Airbnb's "Sign Up" procedure does not resemble the "Sign Up" feature in *Fteja*

1. In Airbnb's Exhibit A, Airbnb's purported landing page contains three separate methods to "Sign Up." A user can "Sign up with Facebook" or "Sign up with Google" or "Sign up with Email." But the hyperlinked terms themselves are submerged directly under the "Sign up with Email" option only. Doc. 13-3, Defendant's Ex. A. This in itself is deceptively confusing for an ordinary consumer.

When viewing Airbnb's website, an ordinary prudent consumer is immediately besieged with various questions and assertions such as: "Am I signing up with Facebook or Google or Airbnb?" "Am I agreeing to additional terms with Facebook or Google even though I already have

an account with them?" An ordinary consumer would ask, "can I still sign up through Facebook or Google without regard to Airbnb's terms?" Any ordinary consumer could essentially conclude that by simply clicking on either Facebook or Google or using their own personal email, then "I am simply bound by the previous terms that I originally agreed to with Facebook or Google or my personal email provider and not Airbnb." Or that Facebook or Google or the users personal email would themselves bind the user with additional terms of privacy, completely unrelated to Airbnb terms. An ordinary consumer could conclude that the procedure to sign up meant that "I am simply going to bind myself to Facebook or Google terms once again and not Airbnb." Or finally, an ordinary prudent consumer would simply not seek to ask or make any assertions because the mere **presence** of the Facebook or Google button that they have long recognized is the fastest route to get them from point A to point Z.

Airbnb's procedure was chaotic. Therefore, it is not unreasonable to believe that Airbnb's primary agenda was to sign up users through use of third party companies and 'sign up' as many users as it could and as rapidly as possible.[6]

2. It is undisputed that Airbnb failed to place the sentence, "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Service, **immediately below** "Sign Up with Facebook" or "Sign Up Google" before Selden gained access to Airbnb.com.

---

[6] Buried in Airbnb's 2014 terms, there is a provision under "Account Registration" related to its use of third party social networking sites to sign up users. Airbnb purportedly tells its users that they can grab whatever information that is contained in their third party accounts without subjecting the company to any liability from the third party site. This provision also exclaims that the "RELATIONSHIPS WITH THE THIRD-PARTY SERVICE PROVERS ASSOCIATED WITH YOUR THIRD-PARTY ACCOUNTS IS GOVERNED SOLELY BY YOUR AGREEMENT(S) WITH SUCH THIRD-PARTY SERVICE PROVIDERS." Doc. 13-4, pg. 4 ¶ 1, *Account Registration*

3. The "arrow" in Defendant's *Exhibit A* cannot be meant to lead anyone into believing that there was a "second step" for consumer assent just as in *Fteja*. This is because the larger box to the right of "smaller box" still asks the consumer whether they want to 'Sign Up with Facebook or Google.' This means that the second larger box is merely repetitious of the smaller first box and that the arrow only leads the consumer to manually sign up with a personal email and password.

4. The hyperlinked "Terms of Service" under "Sign up with Email" in Exhibit A are located extremely close to the other hyperlinked terms, "Privacy Policy" "Guest Refund Policy" and "Host Guarantee Terms." All terms are underlined, highlighted and appear using the same font. What is also telling is that there are two separate "Terms of Service" listed within the same line. Which means that the terms are not conspicuous. *Id at Fteja*. Also notable, Airbnb required users to review all of these hyperlinked terms on a mobile device. *Id at Mohamed,* (holding that terms of service read on a mobile device is "onerous.")

5. Again, the way in which Airbnb oriented it's "Sign Up" method was fundamentally misleading to consumers who routinely used Facebook. Selden states that when he actually clicked to sign up through Facebook.com, he was routed to Facebook.com. *Supra*.  Once on Facebook.com, Selden's personal information, including his name and profile picture were immediately and extracted from Facebook.com and into Airbnb.com without being presented with a box or icon certifying his assent Airbnb's terms of service. *Supra*.  In other words, before his personal information and identifiers would automatically populate via Facebook.com and into Airbnb.com, Airbnb did not inform Selden after he departed the initial "Sign Up" page just as in *Fteja*, that he would have to acknowledge and agree to the terms before gaining access to Airbnb.com (e.g. an admonition through clickwrap).

Airbnb knew that it had never lived up to *Fteja* or any of the other prevalent court opinions that far outweigh it. This is readily apparent by its lack of supporting evidence to establish the standard.[7]

v. <u>The two imitation profiles created by Selden are not enforceable</u>

Notwithstanding the fact that the two imitation profiles were created in the exact same manner and method as Selden's personal profile, they are still not enforceable under general contract principles because they are illusory. See *Asmus v. Pacific Bell,* 23 Cal. 4th 1 (Sup. Ct. 2000).  The profiles were for inferential test purposes only.

vi. <u>Airbnb's 2014 terms were buried in multiple links and amount to an adhesive contract</u>

As the California Supreme Court has explained, procedural unconscionability focuses on "oppression" and "surprise." *Armendariz v. Foundation Health Psychcare Servs.*, 24 Cal. 4th 83, 114, 99 Cal. Rptr. 2d 745, 6 P.3d 669 (2000). "'Oppression arises from an inequality of bargaining power which results in no real negotiation and an absence of meaningful choice. Surprise involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms'" *Tompkins*, 2014 U.S. Dist. LEXIS 88068, 2014 WL 2903752, at *14 (quoting *Tiri*, 226 Cal. App. 4th at 245).

The oppression element is nearly always satisfied when the contract is one of adhesion. *Armendariz*, 24 Cal. 4th at 113. An adhesion contract is a "standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates the subscribing party *only the opportunity to adhere to the contract or reject it." Id.* (emphasis added) (internal quotation marks and citation omitted).

---

[7] Millers declaration attaches Defendant's Exhibit C which purports to show a clickwrap agreement for August 2015. As the facts setforth, the clickwrap came long after Selden. See Doc. 13-2, pg. 3, ¶ 9.

As previously established, Selden accessed the platform in March 2015. Assuming *arguendo* that he was presented with any Terms of service by Defendant at that time, the only terms of service that would have applied to him are terms prior to March 2015. [Plaintiff maintains that he did not agree to any arbitration agreement]. Thus, the terms in *Defendant's Exhibit B* may apply to Selden as it appears that their last update was on June 30, 2014. See Doc. 13-4, pg. 2. Any subsequent updates appearing in Defendant's Exhibit D and E are not applicable because there was no original agreement for the June 30, 2014 terms. As a result, there could not have been a valid modification. *Supra. See also Estate of Wilson,* 64 Cal. App. 3d 786 (1976) (citing, 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, pp. 29, 600 (there must be at least two parties to a contract; modification of a contract requires mutual assent).)

Stepping briefly away from the actual terms, it is important to note that a potential user like Selden seeking Airbnb access immediately through Facebook on their mobile device would have never seen the 2014 terms containing an alleged arbitration provisions. In fact, (as previously mentioned and further analyzed below) not only are those provisions buried deep inside the terms of service, the hyperlinked terms are completely submerged and are no where near the vicinity of the Facebook or Google buttons for an ordinary consumer to see. This is by very its definition the absence of meaningful choice, no real negotiation and in essence a form of  surprise to the unsuspecting ordinary consumer.

As previously described, Airbnb's Exhibit A displays 4 individual or separate hyperlinks dedicated to 4 individual or separate terms of service and policies: and two of which are "terms of service."[8] This means that the lone terms of service that Airbnb attaches to its motion are just a

---

[8] The terms in themselves also contain terms for Copyright provisions and Safe Harbor provisions. Doc. 13-4, Exhibit B, pg. 2 of 8.

morsel of what they required users to read upon signing up for its service. Furthermore, Airbnb required users to do so on a mobile device without an immediate prompt to assent or agree just as in *Mohamed. Supra.* Given this reality, it is undisputed that the terms were in fact buried.

The terms that pertain to Selden are undoubtedly in the form of a standardized contract. Doc. 13-4, Exhibit B, *Terms of Service.* The 2014 standardized contract consists of 18 printed pages, is single-spaced and contains very miniscule font almost naked to the human eye. The terms are also unnumbered and the arbitration provision itself is presented to users on the last pages of the sprawling document. Moreover, ordinary users like Selden that sought to sign up via their mobile phones would have been presented with far harsher standards than described. Put simply, it would take an ordinary consumer like Selden a generation to sift through 2 separate terms of service (4 links total) and locate an arbitration provision buried at the end of one any of the many documents. Given this, the arbitration clause was an inconspicuous clause in an inconspicuous provision of the terms to which ordinary consumers were required to assent to. *See O'Connor v. Uber Techs., Inc.,* 2013 U.S. Dist. LEXIS 172477 (Cal. Nor. Dist. 2013). Aribnb undoubtedly hid the arbitration provisions in a prolix printed form drafted by a party seeking to enforce the disputed terms. *Id at Tompkins.*

vii. <u>Airbnb's alleged arbitration clause does not include an opt out clause for consumers</u>

Airbnb does not provide the consumer an opportunity to Opt-Out of the alleged arbitration agreement in the event they do not want to be bound by the arbitration agreement. Courts have held that arbitration provisions contained in agreements required as part of a purchase of a good [or service] or as a condition of employment that do not provide an opportunity to opt out of the arbitration requirement are still considered adhesion contracts and, as such, are held to be procedurally unconscionable. See, e.g., *Cayanan v. Citi Holdings, Inc., 928 F. Supp. 2d 1182, 1204*

*(S.D. Cal. 2013)* (applying Nevada, California, and South Dakota law, and finding that arbitration provisions without the opportunity to opt out were procedurally unconscionable but those with that opportunity were not procedurally unconscionable). By failing to provide consumers with an opportunity to opt-out Airbnb's purported arbitration agreement is unenforceable as a contract of adhesion.

viii. <u>Airbnb's arbitration provisions are substantively unconscionable</u>

Unconscionability under California law is a generally applicable contract defense and therefore applies to arbitration agreements regardless of whether the Federal Arbitration Act, 9 U.S.C. § 1 et seq., applies. State courts are not obliged to enforce contractual terms that are found to be unconscionable or contrary to public policy under general contract law principles. *Sanchez v. Western Pizza Enterprises, Inc.,* 172 Cal. App. 4th 154 (2nd Dist. Ct. App. 2009). Substantively unconscionable terms may take various forms, but may generally be described as unfairly one-sided. *Id.*

a. <u>Airbnb's Terms are undoubtedly overbroad, vague ambiguous and lack mutuality</u>

Once again, Airbnb cannot have it both ways. Airbnb's provision that "you and Airbnb agree that any dispute, claim or controversy arising out of or relating to these terms of the breach, termination, enforcement, interpretation or validity thereof," is overbroad, vague, ambiguous and lacks mutuality.

It cannot profoundly exclaim that they do not have any liability associated with its hosts agents regarding any state or federal civil rights law and policies, and then suddenly retreat behind its arbitration clause in order to preclude judicial remedies for serious and historical statutory claims. Specifically, Airbnb purports to indicate to consumers (and this court) that its "Airbnb is not a party to any agreements entered into between hosts and guests, nor is Airbnb a real estate broker,

agent, or insurer. Airbnb has no control over the conduct of hosts, guests and other users of the site, application and services or any accommodations." Doc. 13-4, pg. 1 ¶ 5, *Terms of Service*.

From its face, it appears that Airbnb is essentially stating that they are not "responsible" for their hosts discriminatory conduct against users. On the other hand, in the event they might pay for hosts discriminatory conduct, and the only way that they might is through arbitration. Further, the terms suggest that if a user does come forth with a complaint against a host for discrimination, that they forbid their users from bringing class arbitration or class actions for statutory claims for which they purportedly do not control, if the complaint exceeds a maximum dollar amount of $75,000. Airbnb will also require users to pay for their arbitration costs if they choose to bring forth a complaint of discrimination against a host that they do not control, if the complaint does not reach a maximum dollar amount.

A specific example of how Airbnb's purported arbitration clause is devoid of mutuality can be illustrated by two distinct scenarios of how a consumer would have to obtain relief for misconduct on the account of an Airbnb host:

A) If the consumer chooses to sue the host individually for misconduct (as opposed to Airbnb), this route would become unquestionably cumbersome for the user. Again, Airbnb suggests that it does not control or is not responsible for host conduct. Doc. 13-4, pg. 1 ¶ 5, *Terms of Service*.[9] But if the host wanted to sue the user, then the user would have to request information pertaining to the host from Airbnb because Airbnb has the hosts personal information on its platform. Doc. 13-4, pg. 12, ¶ 2, *Privac*y, *See also* Doc. 13-4, pg. 13, ¶ 5, *Member Content*, See also Doc. 13-4, pg. 2, ¶ 6, *Key Terms:* see "*Member Content.*"   Which means that the user, if they can afford to do

---

[9] As the premise of Plaintiff's complaint is premised on the fact that Airbnb does have actual control over the hosts on its website, Plaintiff vehemently and steadfastly maintains that it does.

so, would have to hire an attorney because Airbnb will not disclose the host information unless ordered to do so by law ("subpoenas or warrants"). Doc. 13-4, pg. 11, ¶ 18-19, *User Conduct*. But if the user is lucky, they may be able to get the information **if** Airbnb does not ignore them or immediately kick them off the platform right away for reporting user conduct. Doc. 13-4, pg. 14, ¶ 3, *Suspension, Termination, and Airbnb Account Cancellation*. Without these steps a user would not be able to assert their statutory rights without going through an administrative process. Not to mention, this route would undoubtedly restrain a user from asserting statutory rights for the benefit of a class.

B) If the consumer chooses to avoid the tormenting path noted above and proceeds to immediately file a lawsuit against Airbnb Inc. directly, it risks or simply submits themselves to arbitration pursuant to an alleged Airbnb arbitration clause which purportedly covers any dispute that may "relate to" harm suffered in some form or fashion. Doc. 13-4, pg. 16, ¶ 8, *Dispute Resolution*. A user would then be required to hire an attorney to either fight or submit to arbitration. If they choose arbitration (whether or not they can afford an attorney or not), Airbnb will then subject the user to costs for arbitration if they do not meet a damage threshold. *Id.* But again, the clause would still limit the consumer's ability to bring a class wide arbitration or class action complaint.

Airbnb's terms are without a question unfairly one-sided and unreasonably favor Airbnb. *Sonic-Calabasas A., Inc. v. Moreno* 57 Cal. 4th 1109 2013. Selden, and consumers similarly harmed, did not have a representative or someone with their interests to negotiate terms in order to protect their statutory rights. See infra *Cole v. Burns Int'l Sec. Servs.,* 105 F.3d 1465 (D.C. Cir. 1997). They should not be relegated to the take-it-or-leave-it-basis atrocious terms from Airbnb. *Id.* The terms are substantively unconscionable.

ix.     Airbnb's arbitration costs are unconscionable

The existence of large arbitration costs as seen in this case would render Airbnb's arbitration agreement unenforceable. The U.S Supreme Court has emphasized that"[i]t may well be that the existence of large arbitration costs could preclude a litigant . . . from effectively vindicating her federal statutory rights," and, therefore, an arbitration agreement could itself be unenforceable. *Green Tree Fin. Corp.–Ala. v. Randolph, 531 U.S. 79, 90 (2000).* In the case at bar, if the user's claim is for under $75,000- Airbnb will pay all arbitration fees unless the arbitrator determines the user's claim was frivolous or brought for an improper purpose. This means that if the claim exceeds $75,000 the user would be forced to pay high arbitration costs before ever getting relief despite the fact that the user may not afford such fees while Airbnb can afford them. Accordingly, this renders Airbnb's arbitration clause unenforceable.

## II.     SELDEN'S CLAIMS DO NOT FALL WITHIN AIRBNB'S ARBITRATION PROVISION OR THE FEDERAL ARBITRATION ACT

Airbnb is a San Francisco, California based public accommodations online platform that seeks to absolve itself from any and all discrimination statutes in the United States of America. Airbnb bluntly attempts to eviscerate Selden, and those similarly situated, from civil rights protections by merely suggesting that their claims are "arising out of or relating to" language in its arbitration provision excuses it from a judicial forum and into the hands of an arbitrator. The company scantly argues that Plaintiff should be required to surrender his discrimination claims to arbitration because his claims "relate to" his use of Airbnb's platform. .(See, pp.16-17 of Dkt No. 13-1) Airbnb notes that the Supreme Court has held that "even statutory discrimination claims – "**may** be the subject of an arbitration agreement." *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26 (1991) Further, that Plaintiff's Section 1981 and Fair Housing Act claims 'may' be arbitrated. *Id.*   It is

true that Plaintiff has brought claims under these statutes and will therefore vigorously argue that they cannot be arbitrated. However, Airbnb also conveniently fails to acknowledge that Selden's suit has also instituted claims pursuant to Title II of the Civil Rights Act of 1964. As demonstrated further below, history will show that such claims do not and cannot fall within the category of arbitration.

Unless an arbitration agreement otherwise stipulates, a court is empowered only to determine the substantive issue of arbitrability, that is, whether a particular dispute falls within the scope of an arbitration clause, and the necessary threshold question of whether that clause is enforceable. *Supra at W&T Travel Servs., LLC,* 69 F. Supp. 3d 158 (D.C. Dis. 2014). In the case at hand, there was no agreement between Selden and Airbnb to arbitrate and the claims do not fall within the scope of arbitration. As demonstrated further, none of the claims asserted by Selden can be bound to arbitration.

The U.S. Supreme Court has  made it clear that claims based on statutory rights may be arbitrated pursuant to the FAA "**unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue**." *Morris v. Ernst & Young LLP*, 2013 U.S. Dist. LEXIS 95714 (Cal. Nor. Dist. 2013), citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985) (further holding the dominant characteristic of civil rights actions is that they belong in court. These causes of action exist independent of any other legal or administrative relief that may be available as a matter of federal or state law. They are judicially enforceable in the first instance.) *See also Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20 (1991).

    i.    <u>Claims arising from Title II of the 1964 Civil Rights Act are not arbitrable</u>

The 1964 Civil Rights Act is the backbone of the modern day American civil rights movement.

The intent of Title II of the Civil Rights Act of 1964 was to end discrimination in public

accommodations affecting interstate commerce. *Heart of Atlanta Motel v. United States,* 379 U.S.

241 (1964). The Commerce Clause grants Congress the power to prohibit private discrimination

by the public accommodations as specified in Title II. *Id.*

In full, Title II states:

**SEC. 201. (a) All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, and privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.**

**(b) Each of the following establishments which serves the public is a place of public accommodation within the meaning of this title if its operations affect commerce,** or if discrimination or segregation by it is supported by State action:

**(1) any inn, hotel, motel, or other establishment which provides lodging to transient guests,** other than an establishment located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his residence;

(2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the
premises of any retail establishment; or any gasoline station;

(3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; and

**(4) any establishment (A)(i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment.**

**(c) The operations of an establishment affect commerce within the meaning of this title if (1) it is one of the establishments described in paragraph (1) of subsection (b);** (2) in the case of an establishment described in paragraph (2) of subsection (b), it serves or offers to serve interstate travelers or a substantial portion of the food which it serves, or gasoline or other products which it sells, has moved in commerce; (3) in the case of an establishment described in paragraph (3) of subsection (b), it customarily presents films, performances, athletic teams, exhibitions, or other sources of entertainment which move in commerce; and **(4) in the case of an establishment described in paragraph (4) of subsection (b), it is physically located within the premises of, or there is physically located within its premises, an establishment the operations of which affect commerce within the meaning of this subsection. For purposes of this section, "commerce" means travel, trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia and any State, or between any foreign country or any territory or possession and any State or the District of Columbia, or**

**between points in the same State but through any other State or the District of Columbia or a foreign country.**

(d) Discrimination or segregation by an establishment is supported by State action within the meaning of this title if such discrimination or segregation (1) is carried on under color of any law, statute, ordinance, or regulation; or (2) is carried on under color of any custom or usage required or enforced by officials of the State or political subdivision thereof; or (3) is required by action of the State or political subdivision thereof.

(e) The provisions of this title shall not apply to a private club or other establishment not in fact open to the public, except to the extent that the facilities of such establishment are made available to the customers or patrons of an establishment within the scope of subsection (b).

**SEC. 202. All persons shall be entitled to be free, at any establishment or place, from discrimination or segregation of any kind on the ground of race, color, religion, or national origin, if such discrimination or segregation is or purports to be required by any law, statute, ordinance, regulation, rule, or order of a State or any agency or political subdivision thereof.**

**SEC. 203. No person shall (a) withhold, deny, or attempt to withhold or deny, or deprive or attempt to deprive, any person of any right or privilege secured by section 201 or 202,** or (b) intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person with the purpose of interfering with any right or privilege secured by section 201 or 202, or (c) punish or attempt to punish any person for exercising or attempting to exercise any right or privilege secured by section 201 or 202.

**SEC. 204. (a) Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by section 203, a civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order, may be instituted by the person aggrieved and, upon timely application, the court may, in its discretion, permit the Attorney General to intervene in such civil action if he certifies that the case is of general public importance. Upon application by the complainant and in such circumstances as the court may deem just, the court may appoint an attorney for such complainant and may authorize the commencement of the civil action without the payment of fees, costs, or security.**

**(b) In any action commenced pursuant to this title, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, and the United States shall be liable for costs the same as a private person.**

(c) In the case of an alleged act or practice prohibited by this title which occurs in a State, or political subdivision of a State, which has a State or local law prohibiting such act or practice and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no civil action may be brought under subsection (a) before the expiration of thirty days after written notice of such alleged act or practice has been given to the appropriate State or local authority by registered mail or in person, provided that the court may stay proceedings in such civil action pending the termination of State or local enforcement proceedings.

(d) In the case of an alleged act or practice prohibited by this title which occurs in a State, or political subdivision of a State, which has no State or local law prohibiting such act or practice, a civil action may be brought under subsection (a): Provided, That the court may refer the matter to the Community Relations Service established by title X of this Act for as long as the court believes there is a reasonable possibility of obtaining voluntary compliance, but for not more than sixty days: Provided further, That upon expiration of such sixty-day period, the court may extend such

period for an additional period, not to exceed a cumulative total of one hundred and twenty days, if it believes there then exists a reasonable possibility of securing voluntary compliance.

SEC. 205. The Service is authorized to make a full investigation of any complaint referred to it by the court under section 204(d) and may hold such hearings with respect thereto as may be necessary. The Service shall conduct any hearings with respect to any such complaint in executive session, and shall not release any testimony given therein except by agreement of all parties involved in the complaint with the permission of the court, and the Service shall endeavor to bring about a voluntary settlement between the parties.

SEC. 206. (a) Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this title, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate district court of the United States by filing with it a complaint (1) signed by him (or in his absence the Acting Attorney General), (2) setting forth facts pertaining to such pattern or practice, and (3) requesting such preventive relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible for such pattern or practice, as he deems necessary to insure the full enjoyment of the rights herein described.

(b) In any such proceeding the Attorney General may file with the clerk of such court a request that a court of three judges be convened to hear and determine the case. Such request by the Attorney General shall be accompanied by a certificate that, in his opinion, the case is of general public importance. A copy of the certificate and request for a three-judge court shall be immediately furnished by such clerk to the chief judge of the circuit (or in his absence, the presiding circuit judge of the circuit) in which the case is pending. Upon receipt of the copy of such request it shall be the duty of the chief judge of the circuit or the presiding circuit judge, as the case may be, to designate immediately three judges in such circuit, of whom at least one shall be a circuit judge and another of whom shall be a district judge of the court in which the proceeding was instituted, to hear and determine such case, and it shall be the duty of the judges so designated to assign the case for hearing at the earliest practicable date, to participate in the hearing and determination thereof, and to cause the case to be in every way expedited. An appeal from the final judgment of such court will lie to the Supreme Court.

In the event the Attorney General fails to file such a request in any such proceeding, it shall be the duty of the chief judge of the district (or in his absence, the acting chief judge) in which the case is pending immediately to designate a judge in such district to hear and determine the case. In the event that no judge in the district is available to hear and determine the case, the chief judge of the district, or the acting chief judge, as the case may be, shall certify this fact to the chief judge of the circuit (or in his absence, the acting chief judge) who shall then designate a district or circuit judge of the circuit to hear and determine the case.

It shall be the duty of the judge designated pursuant to this section to assign the case for hearing at the earliest practicable date and to cause the case to be in every way expedited.

SEC. 207. (a) The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this title and shall exercise the same without regard to whether the aggrieved party shall have exhausted any administrative or other remedies that may be provided by law.

(b) The remedies provided in this title shall be the exclusive means of enforcing the rights based on this title, but nothing in this title shall preclude any individual or any State or local

agency from asserting any right based on any other Federal or State law not inconsistent with this title, including any statute or ordinance requiring nondiscrimination in public establishments or accommodations, or from pursuing any remedy, civil or criminal, which may be available for the vindication or enforcement of such right.

By and through the aforementioned statute, the Congressional intent for "where and how" Selden can bring his Title II claim for this suit is clearly codified by its founders. The historical context for judicial proceedings or court intervention (whether brought by an individual or the Attorney General of the United States) is substantially stated and highlighted above.  The above highlighted section 201 to 203 briefly summarize the statutory rights at issue. *Id at Morris v. Ernst & Young LLP.* The above highlighted sections 204, 206 through 207 highlight the unequivocal Congressional intention to preclude a waiver of judicial remedies. *Id.* Despite this monumental authority, Airbnb still moves this court to begin an assembly line for arbitration complaints against it.

Finally, section 207 of Title II welcomes the addition of other similar discrimination claims consistent with the statute. To that extent, this court, if necessary, should at the very least exercise supplemental jurisdiction over all of the other claims stated in Selden's complaint.

ii.   None of Selden's discrimination claims, including Title II, the Fair Housing Act, Section 1981, disparate treatment and disparate impact are within the scope of Airbnb's arbitration provision

All of the authority that Airbnb cites for its one-sided arbitration provision are from a purview of an employment context. Notably, each case arises from a set of facts where either the employee was represented by a union for negotiation purposes or were afforded the opportunity to read the arbitration provision before agreeing to it. *Supra.*

But before addressing any of Aibnb's meritless arguments, Plaintiff shall remind the court of the principles cited in *Cole v. Burns Int'l Sec. Servs.,* 105 F.3d 1465 (D.C. Cir. 1997) where the

D.C. Circuit carefully discerned the understanding of an arbitration provision from an employer/employee relationship as opposed to and that of a lone consumer in the complex maze of the market place.

The D.C. Circuit Court of Appeals opined that 'Arbitration of public law issues is also troubling, on a less abstract level, because the structural protections inherent in the collective bargaining context are not duplicated in cases involving mandatory arbitration of individual statutory claims.[10] Unlike the labor case, in which both union and employer are regular participants in the arbitration process, only the employer is a repeat player in cases involving individual statutory claims.  As a result, the employer gains some advantage in having superior knowledge with respect to selection of an arbitrator. *See, e.g., Lewis Maltby*, *Paradise Lost--How the* Gilmer *Court Lost the Opportunity for Alternative Dispute Resolution to Improve Civil Rights,* 12 N.Y.L. SCH. J. HUM. RTS. 1, 4-5 (1994) (arguing that individual employees are disadvantaged vis-a-vis employers in determining whether given arbitrator is truly neutral because employees lack financial resources to research arbitrator's past decisions); *Sternlight*, 74 WASH. U. L.Q. at 685 **(arguing that "one-shot players" such as employees and consumers are less able to make informed selections of arbitrators than "repeat-player" companies)**; *Getman*, 88 *YALE L.J.* at 936 (same); Gorman, 1995 U. ILL. L. REV. at 656 (same); Reginald Alleyne, *Statutory Discrimination Claims: Rights "Waived" and Lost In the Arbitration Forum,* 13 HOFSTRA LAB. L.J. 381, 403, 426 (1996) (same).

Additionally, while a lack of public disclosure of arbitration awards is acceptable in the collective bargaining context, because both employers and unions monitor such decisions and the

---

[10] The rationale behind *Cole* is adaptable to Plaintiffs arguments for why the arbitration agreement is substantively unconscionable as well. Plaintiff hereby incorporates the rationale in section "v-a" above as the theories also clearly speak to the heart of unequal bargaining power for a consumer.

awards rarely involve issues of concern to persons other than the parties, in the context of individual statutory claims, a lack of public disclosure <u>may systematically favor companies over individuals</u>. Judicial decisions create binding precedent that prevents a recurrence of statutory violations; it is not clear that arbitral decisions have any such preventive effect. The unavailability of arbitral decisions also may prevent potential plaintiffs from locating the information necessary to build a case of intentional misconduct or to establish a pattern or practice of discrimination by particular companies. *See Sternlight*, 74 Wash. U. L.Q. at 686.'  The court should consider such principles for its determination of arbitrability.

    a.  <u>Airbnb's "arising out of" or "relating to" language is ambiguous and overbroad</u>

Defendant argues that its language "arising out of" or "relating to" is proper to interpret broadly. Doc. 13-1, pg. 16. It also argues that the term "relate to" magically encompasses Selden's discrimination claims. These arguments are empty. First, in *Dowley v. Dewer Ballnatine, LLP,* 2006 U.S. Dist LEXIS 23304 (D.C. Dis. 2006), cited by Airbnb, the court opines than the terms "arising out of" is broad enough to encompass all claims that are "**germane to the subject matter of the contract**." *Id.* Moreover, the court compelled arbitration in *Dowley* contract and arbitration provision governed the termination of the Plaintiff. *Id.* Finally, Defendant cites *Gilmer v. Interstate/Johnson Lane Copr.,* 500 U.S. 20 (1991). But *Gilmer* pre-dates *Dowley* and its theory falls squarely in line with the principles in *Dowley.*

Once again, Airbnb wants to have its cake and to eat it too. Airbnb's terms of service are so ambiguous and overbroad, that it negates its own "arising out of" or "relating to" language in its arbitration provision. Airbnb's arbitration provision does not broadly reach Selden's statutory claims grounded in misconduct from the user <u>because their own terms of service explicitly exclude it</u> from the contract.  As previously stated, Airbnb intentionally excludes and excuses itself from

liability or responsibility for host misconduct. Specifically, if the host's conduct injures a user, then Airbnb is "**NOT A PARTY**" to such injury arising between the user and the host and Airbnb exercises "**NO CONTROL**" over the host's conduct. Doc. 13-4, pg. 2 ¶ 5, *Terms of Service.*[11]  *See also* Doc. 13-1, pg. 10, ¶ 3, *Defendants Mot. To Compel.* Doc. 13-4, pg. 16, ¶ 3, *Reporting Misconduct.* Put simply, the discriminatory conduct of the host (according to Airbnb) cannot "relate to" or "arise out of" conduct for which Airbnb in the first place allegedly had no control and was not a party.

   This ambiguity itself should nullify the agreement against the drafter. *Cole v Burns Int'l Sec. Servs.,* 105 F.3d 1465 (D.C. Cir. 1997), holding *"it is also accepted that ambiguous provisions are construed against the drafter of the contract." Id at Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 115 S. Ct. 1212, 1219, 131 L. Ed. 2d 76 (1995) (holding, respondents cannot overcome the common-law rule of contract interpretation that a court should construe ambiguous language against the interest of the party that drafted it. See, *e. g., United States Fire Ins. Co.* v. *Schnackenberg*, 88 Ill. 2d 1, 4, 429 N.E.2d 1203, 1205, 57 Ill. Dec. 840 (1981); *Graff* v. *Billet*, 64 N.Y.2d 899, 902, 477 N.E.2d 212, 213-214, 487 N.Y.S.2d 733 (1984); Restatement (Second) of Contracts § 206; *United States* v. *Seckinger*, 397 U.S. 203, 210, 25 L. Ed. 2d 224, 90 S. Ct. 880 (1970). Respondents drafted an ambiguous document, and they cannot now claim the benefit of the doubt. The reason for this rule is to protect the party who did not choose the language from an unintended or unfair result.)[12]

---

[11]  Although somewhat mirrored above, plaintiff further incorporates this argument for the arbitration terms as substantively unconscionable.

[12]  The Supreme Court authority cited herein contributes to the substantively unconscionable argument as well. Plaintiff hereby incorporates the rationale in section 'v-a.' above as the theories also clearly speak to the heart of unequal bargaining power for a user or consumer.

Airbnb should not be allowed to cover all four corners of a purported contract in order to suppress bedrock statutory civil rights and commit aggrieved users like Selden to line up individually into arbitration.

### III.    PLAINTIFF'S OBJECTIONS

a. Plaintiff objects to the declaration of Kyle Miller on grounds that Miller's declaration does not affirm that he has firsthand knowledge for events related to Selden's initial sign up in March 2015. Specifically, Miller does not have personal knowledge of what Selden's actual experience or initial encounter was when he originally accessed Airbnb.com.

b.  Plaintiff objects to the declaration of Kyle Miller on grounds that does not distinguish a user's experience on Airbnb.com on a mobile phone from that of user's experience on a personal computer or on any other electronic devices.

c. Plaintiff objects to the declaration of Kyle Miller on grounds that he references various "records" of for Gregory Selden in ¶ 8, 10,12, but fails to produce and authenticate such records showing that Selden signed up or accepted any terms of service.

d. Plaintiff objects to the authenticity of Defendant's screenshots in Exhibit A, Exhibit B, Exhibit C and to this to the extent reserves the right to seek discovery to determine whether the documents produced by it and relied upon by Defendant in its motion (Doc. No. 13) were the product of a system or process capable of producing reliable results.

e. Plaintiff objects to the authenticity of each of the wireframe screenshots produced by Airbnb as they were purportedly created by Miller. Specifically, Plaintiff disputes as to whether the purported wireframes or web pages were the ones that Plaintiff viewed at anytime during his online transactions in March 2015 or any other time thereafter. The screenshots are subject to reasonable dispute because the pages were or could have been changed, modified, and revised over

29

time by Defendant. Plaintiff objects on grounds that screen shots of webpages from the internet are not subject to judicial notice Pursuant to Fed.Rules Evid.Rule 201, 28 U.S.C.A.

**WHEREFORE,** Plaintiff, Gregory Selden, individually and on behalf of those similarly situated, requests that this Court deny Defendant's Motion to Compel Arbitration, and and Dismiss or, in the alternative, to stay pending arbitration in its entirety for any other further relief that this court finds as proper.

Respectfully submitted on this 27th day of July, 2016.

**EMEJURU & NYOMBI LLC**

By: _/ s / Ikechukwu Emejuru_____
    Ikechukwu "Ike" Emejuru, Esq, Bar No. 19262
    Andrew Nyombi, Esq, Bar No. MD0010
    Emejuru & Nyombi L.L.C.
    Attorneys and Counselors at Law
    8403 Colesville Road
    Suite 1100
    Silver Spring, MD 20910
    Telephone: (240) 638 – 2786
    Facsimile: 1-800-250-7923
    iemejuru@enylaw.com
    anyombi@enylaw.com

*Attorneys for Plaintiff Individually and others similarly situated*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 27th day of July 2016, I served the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Ellen S. Kennedy (D.C. Bar No. 461670)
ellen.kennedy@hoganlovells.com
Sean Marotta (D.C. Bar Noo. 1006494)
Sean.marotta@hoganlovells.com
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004

Tel. (202) 637-5600
Fax. (202) 637-5910

Counsel for Defendant


Of Counsel
Neal Katyal
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004

## EMEJURU & NYOMBI LLC

By: */ s /* Ikechukwu Emejuru _____
Ikechukwu "Ike" Emejuru, Esq, Bar No. 19262
Andrew Nyombi, Esq, Bar No. MD0010
Emejuru & Nyombi L.L.C.
Attorneys and Counselors at Law
8403 Colesville Road
Suite 1100
Silver Spring, MD 20910
Telephone: (240) 638 – 2786
Facsimile: 1-800-250-7923
iemejuru@enylaw.com
anyombi@enylaw.com

*Attorneys for Plaintiff Individually and others similarly situated*